```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
LOUISE DOLE and JOHN M. DOLE,
individually and on behalf of J.P.D.,

                    Plaintiffs,        MEMORANDUM & ORDER
                                       14-CV-1283(JS)(ARL)
        -against-

HUNTINGTON UNION FREE SCHOOL DISTRICT
and THE BOARD OF EDUCATION OF THE
HUNTINGTON UNION FREE SCHOOL DISTRICT,

                    Defendants.
----------------------------------------X
Appearances
For Plaintiff:     Steven A. Morelli, Esq.
                   The Law Offices of Steven A. Morelli, P.C.
                   990 Stewart Avenue, Suite 130
                   Garden City, NY 11530

For Defendants:    Christopher Mestecky, Esq.
                   Kelly A. Reape, Esq.
                   Guercio & Guercio
                   77 Conklin Street
                   Farmingdale, NY 11753
```

SEYBERT, District Judge:

Plaintiffs Louise Dole (L.D.) and John M. Dole (J.M.D.) (collectively, "Plaintiffs") commenced this action on February 25, 2014 on behalf of their son, J.P.D,[1] against Defendants the Huntington Union Free School District (the "District") and the Board of Education of the Huntington Union Free School District (the "Board," and together with the District, "Defendants"). Plaintiffs claim, pursuant to 42 U.S.C. § 1983, that Defendants

---

[1] Because J.P.D. is a minor, his name and the name of other minor students will be abbreviated throughout this Memorandum & Order.

1

violated their constitutional rights protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment. (Compl. ¶¶ 38-43.) Plaintiffs also assert state law claims against Defendants for negligence and intentional infliction of emotional distress. (Compl. ¶¶ 44-51.) Pending before the Court is Defendants' motion for summary judgment. (Docket Entry 22.) For the reasons that follow, Defendants' motion is GRANTED.

BACKGROUND[2]

In the fall of 2012, J.P.D was a third grade student in an inclusion class taught by Kimberly Myers-Bender ("Myers-Bender") and Hildi Stanford ("Stanford") at the Southdown Primary School ("Southdown"). (Defs.' 56.1 Stmt., Docket Entry 17-1, ¶¶ 2, 5, 7.) J.P.D. attended Southdown until February 11, 2013, when his parents decided to enroll him in the Portledge School ("Portledge"). (Defs.' 56.1 Stmt. ¶¶ 3, 225.)

I. Sensory Disorder

The parties dispute whether J.P.D. had a sensory disorder when he started the third grade. In support of Plaintiffs' position that J.P.D did suffer from a sensory disorder, L.D. testified that J.P.D. "is a sensory child," "uses his senses to interact, mostly touch," and has difficulty with surrounding

---

[2] The following facts are taken from parties' 56.1 statements, and other evidence submitting in connection with Defendants' motion for summary judgment.

2

noise. (L.D. Dep., Defs.' Affirm. Ex. A,[3] 31:13-19.) However, J.P.D. was never formally diagnosed with a sensory disorder and his parents never asked the District to accommodate J.P.D.'s sensory issues. (Defs.' 56.1 Stmt. ¶¶ 8, 36; L.D. Dep., 35:13-15, 50:21-25.)[4]

II. Bullying at Southdown

In early September 2012, two students in J.P.D.'s class, Q and V, followed J.P.D. at recess and called him names. (Defs.' 56.1 Stmt. ¶¶ 41-44, 46.) J.P.D. did not report this incident to District staff. (Defs.' 56.1 Stmt. ¶ 50.) Then on October 11, 2012, Plaintiffs claim that V and another student named Y physically bullied J.P.D. while he was playing ball during recess. (Def. 56.1's Stmt. ¶¶ 54, 57.) According to J.P.D., the two "went for his neck and his groin." (Defs.' 56.1 Stmt. ¶ 56.) It is disputed whether J.P.D. reported this second incident to his teachers. J.P.D testified that he "told the aide and my parents,

---

[3] The Court notes that Defendants failed to file the exhibits supporting their motion for summary judgment on the public docket as required by the Court's Rules.

[4] According to L.D., J.P.D.'s kindergarten teacher, Mrs. Reinesch, referred J.P.D. to Melody Renick ("Renick"), the school psychologist at Southdown. (L.D. Decl., Docket Entry 24-2, ¶ 4.) L.D. contends that Renick worked with J.P.D. multiple times when he was in kindergarten. (L.D. Decl. ¶¶ 5, 6.) However, Renick testified that she first met J.P.D. when he was in the first grade and never pulled him out of class for any behavioral or sensory issues. (Defs.' 56.1 Stmt. ¶ 19; Renick Dep., Defs.' Affirm. Ex. C, 20:19-25; 23:11-23.)

3

and then the aide told my teacher, and Ms. Myers was supposed to tell the principal, but she did nothing about it, and it happened again." (J.P.D. Dep., Defs.' Affirm. Ex. F, 46:23-47:3.) However, Myers-Bender testified that she never saw J.P.D being bullied and J.P.D. never reported that he was being bullied. (Defs.' 56.1 Stmt. ¶¶ 66-67.)

The day after J.P.D. was physically bulled, J.P.D. was accused of tripping students during a school book fair. (Defs.' 56.1 Stmt. ¶¶ 72, 75-77.) J.P.D.'s mother, L.D., was volunteering at the fair and she met with the school principal, Michelle Marino ("Marino"), Myers-Bender, and Stanford that day to discuss the incident. (Defs.' 56.1 Stmt. ¶¶ 4, 80, 81.) During the meeting, the previous day's bullying incident was also discussed. (Defs.' 56.1 Stmt. ¶ 82.) L.D. testified that she believed that Marino, Myers-Bender, and Stanford were already aware of the bullying incident because when she told them about it, they nodded their heads. (Defs.' 56.1 Stmt. ¶¶ 84-85.) L.D. told Marino that she wanted there to be "no further conflicts." (Defs.' 56.1 Stmt. ¶ 93.) When L.D. asked what was being done to address the bullying they said "things were being done, that you just can't see." (Defs.' 56.1 Stmt. ¶ 87; L.D. Dep. 131:23-24.) That same day, the students who allegedly bullied J.P.D. apologized to him. (Defs.' 56.1 Stmt. ¶ 94.)

Marino subsequently investigated the October 12, 2012 bullying allegations and interviewed J.P.D., the students who bullied him, and J.P.D.'s teachers. (Defs.' 56.1 Stmt. ¶ 96.) Marino then composed a report which indicates that the incident involved "rough play/soccer game." (Defs.' 56.1 Stmt. ¶ 98.) However, L.D. claims the investigation was flawed because one of the students she interviewed was not the student involved in the alleged bullying. (Pl.s' 56.1 Counterstmt., Docket Entry 21, ¶ 96.1.)

It is undisputed that J.P.D. was not physically bullied after the October 11, 2012 incident. (Pl.'s 56.1 Counterstmt. ¶ 117.) Nevertheless, L.D. claims J.P.D. continued to be "emotionally bullied" after that date. (Pl.'s 56.1 Counterstmt. ¶¶ 102.1, 103.2, 103.3, 117.1, 117.2.) In support of this claim, Plaintiffs point to a photograph[5] taken in late October of a student appearing reach out and touch J.P.D's head. (Pls.' 56.1 Counterstmt. ¶ 102.1; Defs.' Affirm. Ex. G.) L.D. also believed that J.P.D.'s friends were also being bullied. (Defs.' 56.1 Stmt. ¶ 118; Pls.' 56.1 Counterstmt ¶ 118.)

---

[5] L.D. took the photograph during the school's harvest festival. (Defs.' 56.1 Stmt. ¶ 107.) While L.D. believes that the photograph depicts student V planning to hit J.P.D. on the head, L.D. did not recall if V actually hit J.P.D. (Defs.' 56.1 Stmt. ¶¶ 108, 109, 110.) Further, L.D. did not show the photograph to District staff. (Defs.' 56.1 Stmt. ¶¶ 111, 112.)

III. The December 12, 2012 Meeting

J.P.D. experienced a number of disciplinary issues in the third grade.[6] (Defs.' 56.1 Stmt. ¶ 34.) On December 4, 2012, Myers-Bender and Stanford invited L.D. to attend a meeting on December 12, 2012 to discuss concerns about J.P.D.'s academics and behavior. (Defs.' 56.1 Stmt. ¶¶ 126, 127; Defs.' Affirm. Ex. I.) Marino and Renick also attended the meeting. (Defs.' 56.1 Stmt. ¶¶ 131, 142.) During the meeting, L.D. again wanted to discuss her concerns about bullying, which she believed was the cause of her son's difficulties. (Defs.' 56.1 Stmt. ¶¶ 41, 140.) Approximately half the meeting was spent discussing J.P.D.'s behavioral issues, while the other half was spent discussing bullying. (Defs.' 56.1 Stmt. ¶ 141.)

IV. The Events of December 13, 2012

On December 13, 2012, recess monitors reported to Myers-Bender that J.P.D. hit or kicked a girl from another class. (Defs.' 56.1 Stmt. ¶¶ 152, 162.) J.P.D. admitted to the reported conduct, appeared remorseful, and intended to apologize to the girl. (Defs.' 56.1 Stmt. ¶¶ 153-54.) But when Myers-Bender told J.P.D. that she planned to call his home, J.P.D. got very upset and told Myers-Bender that he did not want her to call home because

---

[6] Myers-Bender was concerned about J.P.D.'s behavior, which allegedly included eye-rolling, pencil breaking, and falling asleep in class." (Defs.' 56.1 Stmt. ¶ 128.)

6

his father might get mad, break his toys, and hit him with a back scratcher.[7] (Defs.' 56.1 Stmt. ¶¶ 155-59.)

Shortly after 12:30 p.m., Myers-Bender brought J.P.D. to Renick's office. (Defs.' 56.1 Stmt. ¶¶ 161; Pl.s' 56.1 Counterstmt. ¶ 162.1.) Renick testified that when Myers-Bender was describing J.P.D.'s behavior to her, J.P.D. "got very upset, very fearful, started crying, [and] was very scared." (Renick Dep. 38:20-21.) Renick also testified that J.P.D. said that his father scared him and "[t]hat when he gets into trouble, that his father will break his toys, has hit him, that his father has hit his mother." (Renick Dep. 42:24-43:3.)

At about 1:30 p.m., Renick called L.D. and told L.D. that J.P.D. said his father hits him with a back scratcher. (Defs.' 56.1 Stmt. ¶¶ 169, 175.) L.D. denied that J.P.D. was ever hit with the back scratcher. (Defs.' 56.1 Stmt. ¶ 176.)

There is some dispute about how long J.P.D spent in Renick's office. Myers-Bender testified that she was in Renick's office with J.P.D. for approximately thirty minutes, however, Plaintiffs contend that J.P.D. was in Renick's office for over an

---

[7] Although there is no material dispute about what J.P.D. told his teachers and school administrators, J.P.D. testified during his deposition that he merely told Myers-Bender that parents "tapped me with a back scratcher once," and J.P.D.'s father testified that he used the back scratcher to "move J.P.D. along." (J.P.D. Dep. 95:16-17; Pls.' 56.1 Counterstmt. ¶ 159.2.)

7

hour. (See Defs.' 56.1 Stmt. ¶ 200; Pl.s' Counterstmt. ¶¶ 200-200.1.)

Plaintiffs claim that during the meeting in Renick's office, Myers-Bender and Renick attempted to pull J.P.D's pants down to determine whether he had any bruises on his legs. (50-H Exam. of J.P.D., Defs.' Affirm. Ex. J, 46:3-19.) However, J.P.D. testified that Myers-Bender and Renick only attempted to pull down his pants, but were unable to do so because J.P.D. "kept on hitting [them] away." (50-H Exam. of J.P.D. 46:11-12.) Both Myers-Bender and Renick deny that they asked J.P.D. to pull down his pants. (Defs.' 56.1 Stmt. ¶ 195; Myers-Bender Dep., Defs.' Affirm. Ex. B, 28:21-22; Renick Dep. 53:14-16.)

After, Myers-Bender brought J.P.D. back to class, she returned to Renick's office and the two of them contacted Child Protective Services ("CPS") to report their suspicion that J.P.D. was being abused. (Defs.' 56.1 Stmt. ¶¶ 202-04.) Ultimately, CPS determined that the report of suspected abuse was unfounded. (Defs.' 56.1 Stmt. ¶ 207.)

V. J.P.D.'s Enrollment at Portledge

On January 14, 2013, L.D. sent a letter to the Superintendent of Southdown, James Polansky ("Polansky"). (Defs.' 56.1 Stmt. ¶ 212.) When Polansky called L.D several days later, L.D. asked if J.P.D. could be moved to a different class. (Defs.' 56.1 Stmt. ¶¶ 213-14.) L.D. testified that she wanted J.P.D. to

8

be moved because he was not respecting the teachers and there was a growing group of bullies in the class. (Defs.' 56.1 Stmt. ¶ 215.) However, Polansky told L.D. that they did not believe it was a good idea to move J.P.D. (Defs.' 56.1 Stmt. ¶ 217.) Later, Marino also told L.D. that neither J.P.D. nor V could not be moved to another classroom. (Defs.' 56.1 Stmt. ¶¶ 218-20.)

In January 2013, L.D. began exploring options to transfer J.P.D. to a private school. (Defs.' 56.1 Stmt. ¶ 221.) At the end of January 2013, Marino prepared paperwork at L.D.'s request in order to enable J.P.D. to enroll at the Portledge School ("Portledge"). (Defs.' 56.1 Stmt. ¶ 222.) Before Marino filled out the paperwork, she suggested that J.P.D. remain in his current classroom and be provided with a ball to bounce on, in order to address his sensory issues. (Defs.' 56.1 Stmt. ¶ 223.) However, L.D. told Marino that she wanted J.P.D. to enroll in Portledge because the District would not move J.P.D. or V to another classroom. (Defs.' 56.1 Stmt. ¶ 224.) On February 11, 2013, J.P.D. enrolled in Portledge. (Defs.' 56.1 Stmt. ¶ 225.)

Plaintiffs filed this lawsuit on February 25, 2014. Plaintiffs assert two federal claims against Defendants. <u>First</u>, Plaintiffs allege that Defendants retaliated against them in violation of the First Amendment rights when Defendants called CPS after Plaintiffs made complaints about bullying. (See Pl.s' Opp. Br., Docket Entry 24, at 11-12.) <u>Second</u>, Plaintiffs claim that

9

Defendants' actions, including calling CPS and conducting a lengthy and "traumatic" interview of J.P.D., violated their right to substantive due process. (Pl.'s Br. at 11-13.) Pending before the Court is Defendants' motion for summary judgment. (Docket Entry 22.) Defendants argue that Plaintiff's First Amendment retaliation claim must be dismissed because there is no evidence that Defendants called CPS in retaliation for Plaintiffs' bullying complaints. (Defs.' Br., Docket Entry 22-2, at 4-7.) In addition, Defendants assert that the conduct Plaintiffs point to was not sufficiently conscience-shocking or oppressive to support a substantive due process violation. (Defs.' Br. at 12-13.)

DISCUSSION

The Court will first address the applicable legal standard on a motion for summary judgment before turning to the parties' arguments.

I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the

court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1611, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2512. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256, 106 S. Ct. at 2514). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact."). "The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v.

11

Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citation omitted).

II. Plaintiffs' Section 1983 Claims

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S. Ct. 1827, 1830, 118 L. Ed. 2d 504 (1992); 42 U.S.C. ¶ 1982. To make out a viable claim pursuant to Section 1983, a plaintiff must show (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)); see also Rosa R. v. Connelly, 889 F.2d 435, 440 (2d Cir. 1989).

12

A.  First Amendment Retaliation

Defendants argue that Plaintiffs' First Amendment retaliation claim must be dismissed because there is no evidence that Defendants called CPS in retaliation for Plaintiffs' complaints about bullying. (Defs.' Br. at 3.) The Court agrees.

To state a First Amendment Retaliation claim, Plaintiffs must establish that: (1) they had an interest protected by the First Amendment; (2) Defendants' actions were motivated or substantially caused by their exercise of that right; and (3) Defendants' actions effectively chilled the exercise of Plaintiffs' First Amendment right. Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). With respect to the second element, "[e]vidence of improper motive 'may include expressions by the officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'" Anderson v. City of N.Y., 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (quoting Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995)).

In this case, the teachers and school administrators who called CPS are "mandatory reporters" of any suspected child abuse under the New York Social Services Law. See N.Y. Soc. Serv. Law §§ 413(1)(a), 420(1); see Oglesby v. Eikszta, 499 F. App'x 57, 60 (2d Dep't 2012). In that role, "school officials receive immunity from liability whenever they report suspected abuse in good faith,

13

but they are exposed to liability if they willfully fail to do so." Oglesby, 499 F. App'x at 60. New York State courts have held that "'immunity attaches when there is reasonable cause to suspect that the infant might have been abused.'" Rine v. Chase, 309 A.D.2d 796, 797, 765 N.Y.S.2d 648, 649-650 (App. Div. 2003) (quoting Kempter v. Child Protective Servs. of Dep't of Social Servs. of Cty. of Suffolk, 130 A.D.2d 623, 625, 515 N.Y.S.2d 807, 809 (2d Dep't 1987)). Given this difficult statutory role imposed upon teachers and school administrators, the Court must give "unusual deference" to their "decision to report reasonably suspected abuse and neglect." Oglesby, 499 F. App'x at 60.

After reviewing the record, the Court finds that there was reasonable cause to suspect that J.P.D may have been abused. Multiple witnesses testified that J.P.D. was afraid his father would hit him with a back scratcher if he learned about J.P.D.'s misbehavior, and J.P.D. admitted to his teacher and the school psychologist that his father hit him with a back scratcher in the past. Moreover, there is no of evidence to support the proposition that Defendants called CPS to retaliate against Plaintiffs for their complaints about bullying. And even if there was evidence that Defendants were motivated to call CPS because of Plaintiffs' bullying complaints, there is no evidence that Plaintiffs' speech was actually chilled by Defendants' conduct. See Jones v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 275 ("Where a

14

party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." (internal quotation marks and citation omitted)). Plaintiffs did not change their behavior after the Defendants contacted CPS. Rather, Plaintiffs continued to voice their concerns about alleged bullying and lobby school officials to move J.P.D. to another class. Plaintiffs' First Amendment retaliation claim is therefore DISMISSED.

B. Due Process Claim[8]

Plaintiffs also allege that Defendants violated J.P.D.'s substantive due process rights when they interviewed him and subsequently filed a CPS report. (Pl.s' Opp. Br. at 11-13.)

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted). "To prevail on a substantive due process claim, a plaintiff must prove that the conduct at issue was so

---

[8] Defendants move for summary judgment on Plaintiffs' allegations they were denied procedural due process. (Compl. ¶ 40.) However, Plaintiffs' procedural due process claim is deemed abandoned because Plaintiffs failed to respond to Defendants' argument that J.P.D. was not denied a constitutionally protected property interest without due process of law. (See Defs.' Br. at 10-11.)

extreme or egregious that it is fairly viewed as so 'brutal' and 'offensive to human dignity' that it shocks the conscience." McSweeney v. Bayport Bluepoint Cent. Sch. Dist., 864 F. Supp. 2d 240, 252 (E.D.N.Y. 2012) (quoting Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp. 2d 284, 296 (E.D.N.Y. 2004)). "The threshold for establishing a constitutional tort in a school environment is high." J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist., 898 F. Supp. 2d 516, 538 (E.D.N.Y. 2012); Compare Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 170, 172-73 (2d Cir. 2002) (holding a teacher's conduct did not violate due process when he slapped a student in the face after the student accidently cracked an egg during a class project); with Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 249, 252-253 (2d Cir. 2001) (finding a gym teacher's conduct did violate due process when he grabbed and lifted a student by the neck and shouted "I'll kick the shit out of you!," then slammed the student's head against the bleachers and metal fuse box and punched him in the face); See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 276 (2d Cir. 2011) (holding that that "no reasonable jury could conclude that [a principal's] report to [State Department of Child and Family Services], or the resulting requirement that [the student] be psychiatrically evaluated, was even remotely outrageous or conscience-shocking.") (internal quotation marks omitted).

Defendants did not take any actions in this case that were "arbitrary, conscience-shocking, or oppressive in a constitutional sense." Lowrance, 20 F.3d at 537 (internal citations omitted). With respect to their call to CPS, Myers-Bender and Renick acted reasonably in light of J.P.D.'s statements about his treatment at home and their mandatory obligations under New York Social Services Law to report potential abuse. In addition, the fact that Defendants questioned J.P.D. in Renick's office for over an hour is not shocking, given their suspicion that J.P.D. was being abused. Finally, if it is true that school administrators forcibly attempted to remove J.P.D.'s pants to view bruises on his body, their actions may rise to the level of negligence. However, "[c]ommon negligence is categorically insufficient to shock the conscience" for purposes of establishing a substantive due process violation. Cox, 654 F.3d at 276. Therefore, Plaintiffs' substantive due process claim is DISMISSED.[9]

III. State Law Claims

Plaintiffs assert state law claims for negligence and intentional infliction of emotional distress. (Compl. ¶¶ 44-51.) However, having determined that Plaintiffs' federal claims against

---

[9] Plaintiffs also assert a procedural due process claim in their Complaint, (see Compl. ¶¶ 39-40), however, Plaintiffs do not oppose Defendants' arguments with respect to that claim on summary judgment. Plaintiffs' procedural due process claim is therefore deemed abandoned.

17

Defendants do not survive summary judgment, the Court finds that retaining jurisdiction over Plaintiff's state law claims is not warranted. See 28 U.S.C. § 1367(c)(3). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" Birch v. Pioneer Credit Recovery, Inc., No. 06-CV-6497, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir. 1986)); Burton v. Gagliano, No. 10-CV-5821, 2016 WL 4385825, at *16 (E.D.N.Y. July 21, 2016), report and recommendation adopted, No. 10-CV-5821, 2016 WL 4385911 (E.D.N.Y. Aug. 16, 2016) ("Plaintiffs proceeded at their own risk in pursuing redress in federal court"). Therefore, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and they are DISMISSED WITHOUT PREJUDICE.

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket Entry 22) is GRANTED and Plaintiffs' federal claims are DISMISSED WITH PREJUDICE.  In addition, Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).  The Clerk of the Court is directed to mark this matter CLOSED.


SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September __8__, 2016
       Central Islip, New York